3 F.3d 238
 Donald E. COLLINS and Financial Placements, Inc., A Missouri
Corporation, Appellants,
v.
ENVIRONMENTAL SYSTEMS COMPANY, A Delaware Corporation, Appellee,
and Melvyn L. Bell.
FINANCIAL PLACEMENTS, INC., A Missouri Corporation, Appellant,
v.
ENVIRONMENTAL SYSTEMS COMPANY, A Delaware Corporation, and
Melvyn L. Bell, Appellees.
 Nos. 92-3519, 92-3521.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 17, 1993.
Decided Aug. 12, 1993.
Rehearing Denied Sept. 21, 1993.
 
 Robert Arthur Brunig, Minneapolis, MN, argued (Murray Miller, Phoenix, AZ, on the brief), for appellants.
 Joseph W. Anthony, Minneapolis, MN, argued (Leslie S. McEvoy and Leny K. Wallen-Friedman, on the brief), for appellees.
 Before JOHN R. GIBSON, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 MORRIS SHEPPARD ARNOLD, Circuit Judge.
 
 
 1
 Financial Placements and Donald Collins appeal judgments of the trial court[1] that claims related to two promissory notes and a stock transfer are barred by the statute of limitations. We affirm the judgments.
 
 I.
 
 2
 In 1972, Pollution Controls, Inc. (PCI), was operating a facility in Minnesota that disposed of hazardous waste. The company was in perilous financial straits and was seeking additional sources of operating capital.
 
 
 3
 On August 4, 1972, PCI executed a promissory note for $5,000 in favor of Financial Placements, Inc., and Melvyn Bell. The note provided for payment of $5,000 to Financial Placements and Mr. Bell at the end of 30 days. The interest on the note was 2,500 shares of PCI stock.
 
 
 4
 On August 28, 1972, PCI executed a promissory note for $20,000 in favor of Financial Placements, Inc., and Donald Collins. That note provided for payment of $20,000 to Financial Placements and Mr. Collins at the end of six months. The interest on that note was 10,000 shares of PCI stock. Both notes executed by PCI further provided that if the principal was not paid when due, the payees could receive, at their option, more PCI stock as additional interest on the note.
 
 
 5
 By late 1972, Melvyn Bell was the majority shareholder in PCI. The company expanded over the years and eventually became part of Environmental Systems Company (ESC). The current value of ESC stock is considerable.
 
 
 6
 Financial Placements and Mr. Collins eventually demanded payment (apparently in early 1990) on the promissory notes, including a demand for back interest in the form of ESC stock. (It is undisputed that the principal on the notes was not paid at the end of the specified terms. It may have been paid later on one or both of the notes; whether it was and to whom remains in dispute. There is no question, however, that no stock shares for additional interest were ever transferred to Financial Placements or Mr. Collins.) ESC refused to pay. Financial Placements and Mr. Collins then sued ESC and Mr. Bell in two related lawsuits filed in April, 1991.
 
 
 7
 In one lawsuit, Financial Placements alleged that Mr. Bell had received the proceeds of the $5,000 promissory note but had failed to ensure that Financial Placements received the half-portion of the proceeds due to it. That lawsuit further alleged that in addition to its half-portion of the $5,000 promissory note, Financial Placements was owed additional interest on that note in the form of approximately 326,000 shares of ESC stock. In the other lawsuit, Financial Placements and Mr. Collins alleged that ESC had failed to pay the additional interest due on account of the unpaid principal for the $20,000 promissory note. That interest was alleged to be approximately 2.4 million shares of ESC stock. The trial court granted summary judgment to the defendants on those claims in September, 1992, finding each claim barred by the statute of limitations.
 
 
 8
 Financial Placements also alleged that in 1973, Mr. Bell had directed that 18,750 shares of PCI stock be issued to Charles Robertson, who was at that time an officer of PCI. Financial Placements contended that those shares had actually been intended to be payment to it for services rendered to PCI, that Mr. Robertson had wrongfully converted the stock to his own use, that PCI and Mr. Bell had allowed the stock to be registered in Mr. Robertson's name although it belonged to Financial Placements, and that ESC and Mr. Bell had refused to return the stock to Financial Placements. The trial court granted summary judgment to the defendants on that claim in September, 1992, finding it barred by the statute of limitations.
 
 II.
 
 9
 Financial Placements and Mr. Collins argued in the trial court that the text of the promissory notes included a waiver of the statute of limitations by PCI. The trial court rejected that argument, however, holding that the notes waived "diligence in collection," which was not the same as a waiver of the statute of limitations.
 
 
 10
 The trial court then determined that the notes required a "demand in fact" as a prerequisite for maturity, i.e., before the limitations period would begin to run. See, e.g., Pinch v. McCulloch, 72 Minn. 71, 74 N.W. 897, 898 (1898). The trial court held, however, that even with notes requiring a "demand in fact" as a prerequisite for maturity, the demand must be made within a reasonable time. See, e.g., Bannitz v. Hardware Mutual Casualty Co., 219 Minn. 235, 17 N.W.2d 372, 373 (1945). (We construe this holding as a declaration that such notes will be considered to have matured, as a matter of law, after a reasonable time.)
 
 
 11
 The trial court observed that in cases involving notes subject to a "demand in fact," the Minnesota courts have generally looked to the length of the limitations period to define a reasonable time. See, e.g., Fallon v. Fallon, 110 Minn. 213, 124 N.W. 994, 996 (1910). Using that standard, the trial court concluded that the $5,000 note would have matured in September, 1978, and the $20,000 note in February, 1979--six years after their original due dates, see Minn.Stat.Ann. Sec. 541.05.1(1). Upon maturity, of course, the limitations periods on the notes would have begun to run and would have expired six years later--in September, 1984, on the $5,000 note and in February, 1985, on the $20,000 note. Since Financial Placements and Mr. Collins did not file their lawsuits until 1991, the trial court held, the statute of limitations barred the claims on both notes.
 
 
 12
 On appeal, Financial Placements and Mr. Collins offer two arguments. First, they contend that the trial court erred in holding that PCI did not waive the statute of limitations. Second, they argue that even if PCI did not waive the statute of limitations, the trial court should have applied an interval longer than the limitations period as the reasonable time to be allowed before the notes were considered, as a matter of law, to have matured and, therefore, to have become subject to the limitations period. We address each of those arguments in turn.
 
 
 13
 The promissory notes at issue contain the following language:
 
 
 14
 FOR VALUE RECEIVED, [PCI] promises to pay [in 30 days on the $5,000 note, in six months on the $20,000 note] [to Financial Placements and Melvyn Bell on the $5,000 note, to Financial Placements and Donald Collins on the $20,000 note] ... the principal sum ... with interest thereon in shares of the common stock of [PCI].... Said interest shall be paid regardless of whether the Note is prepaid.
 
 
 15
 It is further agreed among the parties, in connection with and in consideration of the execution of this Note, as follows:
 
 
 16
 1. That, in the event any of the principal or interest is not paid when due, the Payees may exercise whatever rights at law or in equity which are available to them, or, at the Payees' option, they shall be entitled to receive additional interest on the unpaid principal balance [at 8 percent per year], payable in the common stock ... of [PCI], at the rate of five (5) shares of such common stock for every dollar of additional interest accrued....
 
 
 17
 . . . . .
 
 
 18
 4. That the makers, endorsers, sureties and guarantors hereof hereby severally agree to pay all costs of collection, including reasonable attorney's fees, in case payment shall not be made at maturity, and severally waive presentment for payment, notice of non-payment, protest and notice of protest and due diligence in enforcing payment or bringing suit against any party hereto; and the endorsers, sureties and guarantors hereof hereby severally consent that the time of payment may be extended, or this Note renewed, from time to time, without notice to them and without affecting their liabilities hereon.
 
 
 19
 In holding that PCI did not waive the statute of limitations in the promissory notes, the trial court observed that the waiver provisions of the notes extended to "a number of technical requirements under the Uniform Commercial Code, including presentment, protest, and notice." The trial court then stated that a waiver of "diligence in collection" is not a waiver of a statute of limitations and declared that "[a] careful reading leads to the conclusion that the language of the note[s] was not intended to waive the statute of limitations defense." We disagree.
 
 
 20
 It is clear that under Minnesota law, parties to a contract may waive a statute of limitations. See, e.g., State v. Hart Motor Express, Inc., 270 Minn. 24, 132 N.W.2d 391, 394 (Minn.1964). The Minnesota courts have not decided, however (as far as we can tell), whether the exact language in the promissory notes at issue in this case (waiving "diligence in ... bringing suit") effects such a waiver. We note, though, that courts in other states have held that such language does waive a statute of limitations. See, e.g., Ross v. Ross, 96 Ariz. 249, 393 P.2d 933, 934 (1964) (en banc) (although waiver invalid as against public policy, because it effectively repealed a statute of the state); National Bond and Investment Co. v. Flaiger, 322 Mass. 431, 77 N.E.2d 772, 772-73 (1948) (although waiver invalid as against public policy, because it was executed contemporaneously with original contract and therefore defeated the purpose of having a statute of limitations); and Owensboro Savings Bank and Trust Company's Receiver v. Haynes, 143 Ky. 534, 136 S.W. 1004, 1005 (1911).
 
 
 21
 We find those state cases addressing that exact language to be more persuasive than the authority cited by the trial court, see Korf v. Fansler, 57 Ill.App.3d 440, 15 Ill.Dec. 55, 56, 373 N.E.2d 325, 326 (1978), or cases from other state courts that deal with different phrases. We believe that the Minnesota Supreme Court would also find those cases to be persuasive, especially since we have found no cases construing that exact language that have rejected the idea that such language is a waiver of a statute of limitations.
 
 
 22
 We hold, therefore, that the text of the promissory notes at issue in this case did waive the six-year statute of limitations. That conclusion, however, does not end our inquiry, for even the courts that uphold the validity of such waivers do not agree on the question of whether that validity may extend indefinitely or only for some reasonable time. See generally Annotation, Validity of Contractual Waiver of Statute of Limitations, 1 A.L.R.2d 1445, Sec. 8 at 1454-56 (1948); see also 12 Am.Jur.2d Bills and Notes Sec. 1067 at 91-92 (1964), and 51 Am.Jur.2d Limitation of Actions Sec. 429 at 898 (1970).
 
 
 23
 We believe that the Minnesota Supreme Court would hold that the waiver of a statute of limitations is valid only for a reasonable time. In circumstances where a contract has prescribed a period for bringing suit that is shorter than the limitations period, the Minnesota Supreme Court has required that the interval be a reasonable one. See, e.g., Hayfield Farmers Elevator and Mercantile Co. v. New Amsterdam Casualty Co., 203 Minn. 522, 282 N.W. 265, 269 (1938). We see no reason why that court would not apply the same rule in circumstances where the parties have essentially extended a limitations period (by waiving it).
 
 
 24
 We also note that in other contexts where an indefinite time is contemplated by the parties for some event to take place that triggers the running of a limitations period, the Minnesota Supreme Court has declared that if the event does not occur within a reasonable time, the limitations period will nonetheless be considered to have begun. See, e.g., Bannitz, 17 N.W.2d at 373-74; Andrews v. Andrews, 170 Minn. 175, 212 N.W. 408, 411 (1927); and Fallon, 124 N.W. at 996. In this case, therefore, we hold that although PCI waived the statute of limitations in the promissory notes, that waiver was valid only for a reasonable time.
 
 
 25
 What is a reasonable time in the circumstances of this case? We observe that in other contexts, the Minnesota Supreme Court has characterized the interval of the limitations period as a reasonable time, under ordinary circumstances, for certain events. See, e.g., Bannitz, 17 N.W.2d at 373-74; Andrews, 212 N.W. at 411; and Fallon, 124 N.W. at 996 (reasonable time for "demand in fact" to be made, under ordinary circumstances, where its making would trigger the beginning of the limitations period on a contract). We see no reason why the Minnesota Supreme Court would not use the same principle in deciding what a reasonable time is for the effectiveness of a waiver of a statute of limitations. Using the interval of the limitations period as a reasonable time, the waiver on each promissory note would have been effective for six years from the time the notes matured. The limitations period would have begun running at that point and would have expired six years later. We must turn, then, to the question of when the notes matured.
 
 
 26
 We take as a given for purposes of this opinion, but do not decide, that the notes in question are indeed the kind that require a "demand in fact" as a prerequisite for maturity. We believe that the trial court was correct in holding that under Minnesota law, notes requiring a "demand in fact" as a prerequisite for maturity will be held to have matured after a reasonable time. See, e.g., Bannitz, 17 N.W.2d at 373-74; Andrews, 212 N.W. at 411; and Fallon, 124 N.W. at 996. Those cases declare that the reasonable time ordinarily to be applied is that of the limitations period. The cases observe, however, that " 'where the parties contemplated a delay in making the demand to some indefinite time in the future, the statutory period for bringing [an] action is not controlling as to the question of reasonable time.' " Bannitz, 17 N.W.2d at 373, quoting Fallon, 124 N.W. at 996; see also Andrews, 212 N.W. at 411. That observation is the basis for the argument by Financial Placements and Mr. Collins that a period of longer than six years should be used in this case to establish the time of maturity, as a matter of law, for the promissory notes. We disagree.
 
 
 27
 Financial Placements and Mr. Collins cite only six Minnesota cases that have allowed a longer interval than that of the limitations period in deciding whether a "demand in fact" was made beyond a reasonable time. Five of those cases concern transactions between family members. See Wigdale v. Anderson, 193 Minn. 384, 258 N.W. 726, 727 (Minn.1935) (brothers-in-law), Andrews, 212 N.W. at 409 (brothers), Fallon, 124 N.W. at 995 (sister and brother), Portner v. Wilfahrt, 85 Minn. 73, 88 N.W. 418, 418 (1901) (parents and son), and In re Estate of Fauskee, 497 N.W.2d 324, 325 (Minn.Ct.App.1993) (mother and son). The sixth concerns an employer who owed sales commissions to a former employee. See Bannitz, 17 N.W.2d at 372.
 
 
 28
 The opinions do state that a "confidential and fiduciary relationship" is not necessarily dispositive, id. at 374. See also Andrews, 212 N.W. at 411, and Fallon, 124 N.W. at 995-96. They also state, however, either explicitly or implicitly, that the relationship between the parties in those cases was "not an ordinary one of creditor and debtor," Bannitz, 17 N.W.2d at 374. See also Wigdale, 258 N.W. at 727-28; Andrews, 212 N.W. at 409, 411; Fallon, 124 N.W. at 995-96; Portner, 88 N.W. at 418-19; and In re Estate of Fauskee, 497 N.W.2d at 329. Financial Placements and Mr. Collins offer nothing to show that the relationship between them and PCI was not an ordinary creditor-debtor one. We hold, therefore, that the interval most appropriate as a reasonable time in which a demand should have been made is that of the limitations period--six years.
 
 
 29
 Using that standard, the $5,000 note would have matured in September, 1978, and the $20,000 note in February, 1979. In those months, the period of waiver would have begun and would then have expired on the $5,000 note in September, 1984, and on the $20,000 note in February, 1985. The limitations periods would have begun to run when the periods of waiver ended. The limitations periods would have expired, therefore, in September, 1990, for the $5,000 note and in February, 1991, for the $20,000 note. Financial Placements and Mr. Collins did not file their lawsuits until April, 1991. Under these circumstances, the claims based on the promissory notes are barred by the statute of limitations. We therefore affirm the judgments of the trial court with respect to those claims.
 
 III.
 
 30
 We turn now to the conversion claim made by Financial Placements and related to the stock transfer from PCI to Charles Robertson. According to the complaint, the property allegedly converted was "18,750 shares of the common stock" of PCI.
 
 
 31
 In its brief, Financial Placements appears to argue that several different conversions took place, involving as recipients both Mr. Robertson and Mr. Bell and totaling approximately 31,250 shares. We find it difficult to follow the description in the brief of all of the transactions alleged. So, apparently, did the trial court; its opinion states that additional conversion claims were raised by Financial Placements in its response to the summary judgment motion but would not be considered since only the amount of 18,750 shares was specified in the complaint. We believe that the trial court's approach was correct; we therefore focus only on the transfer of 8,750 shares involving Mr. Robertson (Financial Placements has abandoned on appeal its claim with respect to a prior transfer to Mr. Robertson, of 10,000 shares).
 
 
 32
 The limitations period for conversion is six years. See Minn.Stat.Ann. Sec. 541.05.1(4). The limitations period begins to run when the conversion occurs unless it was concealed. See, e.g., Williams v. Davis, 182 Minn. 186, 234 N.W. 11, 13-14 (1930). In the case of concealment, the limitations period begins to run when the actual owner of the converted property has or could, with reasonable diligence, obtain notice of the conversion. See, e.g., Jones v. Boyd Transfer and Storage Co., 323 F.2d 998, 1002 (8th Cir.1963), and First National Bank v. Strait, 71 Minn. 69, 73 N.W. 645, 646 (1898); see also Wild v. Rarig, 302 Minn. 419, 234 N.W.2d 775, 794-95 (1975) (en banc) (per curiam), cert. denied, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976).
 
 
 33
 In its opinion granting summary judgment to the defendants on the conversion claim, the trial court noted that the first stock transfer (of 10,000 shares) to Mr. Robertson that was directed by Mr. Bell was specifically described in a letter from Mr. Robertson to Nathan Colletta, then an officer of Financial Placements, in April, 1973. The trial court further noted that both transfers were described in the PCI annual report and agenda for stockholders' meeting, which contains references indicating that it was sent to all shareholders in January, 1974. Mr. Colletta was a shareholder at that time. Finding, therefore, that officers of Financial Placements had notice as of January, 1974, of both stock transfers to Mr. Robertson, the trial court held that the limitations period began to run at that time. It expired, accordingly, in January, 1980.
 
 
 34
 On appeal, Financial Placements contends that an issue of fact exists with respect to whether Mr. Colletta actually received the January, 1974, annual report and agenda for stockholders' meeting. We construe that contention as an argument that Financial Placements (through Mr. Colletta) had no notice of the stock transfer to Mr. Robertson involving 8,750 shares. We consider a more significant question, though, to be whether there was any evidence of concealment of that transfer, so that notice--rather than the conversion itself--would trigger the running of the limitations period. (The trial court's opinion does not address the question of concealment--only of notice.)
 
 
 35
 Financial Placements offers as evidence of concealment its assertion that PCI did not send copies to Financial Placements of either the documents filed with the state securities commissioner reporting the stock transfers or the letter to the transfer agent requesting that the stock certificates be issued. Financial Placements also points to the April, 1973, letter to Mr. Colletta, which mentioned the first transfer to Mr. Robertson (of 10,000 shares) but did not refer to the second transfer (of 8,750 shares). The only other evidence offered by Financial Placements is an affidavit executed in 1992 by Mildred Colletta (wife of Mr. Colletta, who is now dead), asserting that Financial Placements "was not aware" until 1990 of the stock transfers to Mr. Robertson.
 
 
 36
 We do not believe that the acts of PCI cited by Financial Placements can be considered the type of affirmative acts or misrepresentations that are required to sustain a finding of concealment. See, e.g., Wild, 234 N.W.2d at 793-94. Indeed, we find the publication in the PCI annual report and agenda for stockholders' meeting of the transfers to be good evidence of a lack of intent to conceal. See, e.g., Boyum v. Johnson, 127 F.2d 491, 495-96 (8th Cir.1942). We note, moreover, that Minnesota law places a burden of reasonable diligence on the person pleading concealment. See, e.g., First National Bank, 73 N.W. at 646, and Duxbury v. Boice, 70 Minn. 113, 72 N.W. 838, 839-40 (1897); see also Wild, 234 N.W.2d at 795. In the absence of any evidence that Mr. Colletta, any other officer of Financial Placements, or any other PCI shareholder actually asked PCI about stock transfers and was given incorrect information in response, we hold that the limitations period began to run as of January, 1974, and expired, therefore, in 1980. Financial Placements did not file its lawsuit until 1991. Under these circumstances, the claim for conversion is barred by the statute of limitations. We therefore affirm the judgment of the trial court with respect to that claim.
 
 IV.
 
 37
 For the reasons stated, the judgments of the trial court are affirmed.
 
 
 
 [1]
 The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota